UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK          CASE No.:     1:13-cv-7421 (KPF)
-----------------------------------------------------------------

BOBBY WHITE

                Plaintiff,                                        2ND AMENDED COMPLAINT

       -against-                                              PLAINTIFF(S) DEMAND
                                                                                       TRIAL BY JURY

THE CITY OF NEW YORK &
MARLENE OCASIO

                Defendant(s)

-----------------------------------------------------------------

Plaintiff, BOBBY WHITE, by his attorney, Paul Hale Esq., complaining of the defendants, The City of New York and Corrections Officer MARLENE OCASIO, collectively referred to as the Defendants, upon information and belief alleges as follows:

## NATURE OF THE ACTION

1. This is an action at law to redress the deprivation of rights secured to the plaintiff under color of statute, ordinance, regulation, custom, and or to redress the deprivation of rights, privileges, and immunities secured to the plaintiff by the Fourth, Eighth and Fourteenth Amendments to the Constitution of the United States, and by Title 42 U.S.C. § 1983, § 1988 [and § 1985], [and arising under the law and statutes of the State of New York].

2. This is an action to further seek compensation for the serious and permanent personal injuries sustained by the plaintiff, as a result of the acts of the defendants, perpetrated while said defendant officer was in the process of illegally and unlawfully assaulting plaintiff.

## JURISDICTION

3. The jurisdiction of this Court is invoked under 28 U.S.C. §1343(3), this being an action authorized by law to redress the deprivation of rights secured under color of state and city law, statute, ordinance, regulation, custom and usage of a right, privilege and immunity secured to the plaintiff by the Fourth, Eighth and Fourteenth Amendment to the Constitution of the United States.

4. All causes of action not relying exclusively on the aforementioned federal causes of action as a basis of this Court's jurisdiction are based on the Court's supplemental jurisdiction pursuant to 28 U.S.C. §1367 to hear state law causes of action. The events, parties, transactions, and injuries that form the basis of plaintiff's federal claims are identical to the events, parties, transactions, and injuries that form the basis of plaintiff's claims under applicable State and City laws.

5. As the deprivation of rights complained of herein occurred within the Southern District of New York, venue is proper in this district pursuant to 28 U.S.C. §§1391 (b) and (c).

## PARTIES

6. Plaintiff BOBBY WHITE resides in New York and is a resident of the State of New York.

7. Defendant Officer is, and at all times relevant to this action was, an officer of the City of New York Corrections Department and acting under color of state law. Said officer is being sued in both her individual and official capacities.

8. MARLENE OCASIO at all times relevant to this action was an officer with the City of New York Corrections Department and acting under color of state law.  She is being sued

in both her individual and official capacity.

9. The defendant officer were at all material times acting within the scope of their employment, and as such, the defendant City and supervising officers are vicariously liable for the defendant officers' acts as described below.

10. The Defendant, City of New York is a municipality in the State of New York and employs the Defendant Officer and as such is vicariously liable for all its employees.

**FACTUAL ALLEGATIONS COMMON TO ALL CAUSES OF ACTION**

11. On 9/28/2013 at approximately 12:45 pm plaintiff was incarcerated in the George Motchan Detention Center (GMDC) on Rikers Island in East Elmhurst, NY.

12. At the above time and place defendant officer MARLENE OCASIO was employed as a New York City Department of Corrections officer.

13. At the above time and place defendant officer MARLENE OCASIO sprayed a chemical agent on plaintiff while he was in his cell.  MARLENE OCASIO also slammed a metal door on plaintiff's hand.

14. This assault was uncalled for, unnecessary and excessive because MR. WHITE did not pose a threat to MARLENE OCASIO.

15. BOBBY WHITE was not treated for his injuries until hours later despite his pleas for medical attention.

16. Once BOBBY WHITE received treatment, bruising and swelling were observed on his left forearm and he was issued, and told to wear, a sling by medical staff.

17. After BOBBY WHITE made a proper grievance an investigation was conducted into the incident.

18. The investigation found that MARLENE OCASIO's use of force was unwarranted and

unnecessary and recommended disciplinary action. (Report attached as EXHIBIT 1 to Amended Complaint)

19. MARLENE OCASIO did not report the use of force in violation of Use Force Directive 5006R-C page 12.

20. The investigation also found that MARLENE OCASIO's use of force was unnecessary because BOBBY WHITE did not pose a threat to her.

21. Upon information and belief, the only reason MS. OCASIO was disciplined for this attack is that it was caught on video and undeniable.

22. At no time did plaintiff commit any offense against the laws of New York City and or State for which force may be used.

23. As a direct and proximate result of defendants' actions, plaintiff suffered and continues to suffer injuries, including but not limited to emotional distress, nightmares, panic attacks, mental anguish and unwarranted severe anger bouts some or all of which may be permanent.

24. As a direct and proximate result of defendants' actions, plaintiff suffered extreme pain that lasted beyond the initial assault.

25. The unlawful attack of plaintiff without any legitimate cause or justification, were intentional, malicious, reckless and in bad faith.

26. As a direct and proximate result of his unlawful assault Plaintiff has lived in terror of their attack, and continues to suffer from nightmares, are fearful of going outside and when he sees the police, and suffer various emotional attacks, in addition, and has been unable to function normally which has caused a severe strain and breakdown in his personal relationships, in and outside of his home.

27. As a direct and proximate result of defendants' actions, plaintiff was deprived of rights, privileges and immunities under the Fourth, Eighth and Fourteenth Amendments to the United States Constitution and the laws of the City of New York and the State of New York.

28. The actions of defendants, acting under color of State law, deprived plaintiff of his rights, privileges and immunities under the laws and Constitution of the United States; in particular, the rights to be secure in his person and property, to be free from the excessive use of force and from malicious prosecution, abuse of process, and the right to due process.

29. By these actions, defendants have deprived plaintiff of rights secured by the Fourth, Eighth, and Fourteenth Amendments to the United States Constitution, in violation of 42 U.S.C. Section 1983.

## AS A FIRST CAUSE OF ACTION:
### 42 U.S.C Section 1983-against all Defendants.

30. Plaintiff hereby restates all paragraphs above of this complaint, as though fully set forth below.

31. By assaulting plaintiff, without justification, probable cause or reasonable suspicion, and using excessive force the Defendants deprived Plaintiff of rights, remedies, privileges, and immunities guaranteed to every citizen of the United States, in violation of 42 U.S.C. Section 1983, including, but not limited to, rights guaranteed by the Fourth, Eighth and Fourteenth Amendments of the United States Constitution.

32. In addition, the Defendants conspired among themselves to deprive plaintiff of his constitutional rights secured by 42 U.S.C. Section 1983, and by the Fourth, Eighth and Fourteenth Amendments to United States Constitution, and took numerous overt steps in

furtherance of such conspiracy, as set forth above.

33. The Defendant acted under pretense and color of state law and in their individual and official capacities and within the scope of their respective employment as a Corrections Officer. Said acts by the Defendant Officer was beyond the scope of their jurisdiction, without authority of law, and in abuse of their powers, and said Defendant acted willfully, knowingly, and with the specific intent to deprive the Plaintiff of his constitutional rights secured by 42 U.S.C. Section 1983, and by the Fourth, Eighth and Fourteenth Amendments to the United States Constitution.

34. As a direct and proximate cause of the acts of the defendants, plaintiff suffered the following injuries and damages:

    A. Excessive force imposed upon him;
    B. Summary punishment imposed upon him;
    C. Denial of medical attention; and
    D. Denied equal protection under the law.

35. As a direct and proximate result of the misconduct and abuse of authority detailed above, Plaintiff sustained the damages herein before stated.

## AS A SECOND CAUSE OF ACTION:
*Monell* claim[1]

36. Upon information and belief, the Defendant City of New York, as a matter of policy and practice, has with deliberate indifference failed to properly sanction or discipline officers including the defendant in this case, for violations of the constitutional rights of inmates, thereby causing officers including the defendant in this case, to engage in unlawful conduct.

---

[1] *Monell v. City of New York Department of Social Services,* 436 U.S. 658

37. Upon information and belief, the Defendant City of New York, as a matter of policy and practice, has with deliberate indifference failed to sanction or discipline officers including the defendant in this case, who are aware of and subsequently conceal violations of the constitutional rights of citizens by other officers thereby causing and encouraging officers including defendants in this case, to engage in unlawful conduct.

38. Defendants' actions, as described herein, were undertaken intentionally, willfully and wantonly.

39. Defendant OCASIO's conduct violated clearly established rights belonging Plaintiff, of which reasonable law enforcement knew or should have known.

History of Abuse on Rikers Island

40. U.S. Attorney Preet Bharara presented a truly horrifying report detailing how inmates are treated in New York City jails. "It is a place where brute force is the first impulse rather than the last resort, a place where verbal insults are repaid with physical injuries, where beatings are routine, while accountability is rare."[2]

41. According to a Department of Justice investigation's findings, as reported by the New York Times and Associated Press[3] there is a "deep-seated culture of violence" against inmates, including 1,057 injuries among males in 565 reported incidents in fiscal 2013. (The report covers 2011 through 2013.)

42. The report states, "Inmates see others being beaten and attacked and are afraid that they will face the same fate," "Simply put, Rikers is a dangerous place for inmates and a pervasive climate of fear exists." "The most egregious inmate beatings frequently occur in locations without video surveillance." Those in charge also tend to lie. For example,

---

[2] http://www.nytimes.com/2014/08/05/nyregion/us-attorneys-office-reveals-civil-rights-investigation-at-rikers-island.html
[3] http://s3.documentcloud.org/documents/1240461/department-of-justice-letter-about-rikers-island.pdf

one officer with 76 uses of force on the books over the span of six years was disciplined one time, the Times notes.

43. The report gives specific examples of abuse at Riker's Island:

> In June 2012, in an apparent act of retribution, two correction officers forcibly took an inmate to the ground and beat him. The officers punched the inmate multiple times and kicked him in the head, resulting in serious injuries including a two-centimeter laceration to his chin that required sutures, a lost tooth, and cracking and chipping to the inmate's other teeth. According to the inmate, who was interviewed by our consultant, prior to the incident one of the officers had called him a "snitch" and was under the false impression that the inmate had previously reported that the officer had been involved in another use of force incident.
>
> An inmate reported that he was punched and stomped on by several officers in a school corridor after verbally insulting one of them during an argument. He asked to go to the medical clinic, but the officers refused to take him there, giving him tissues to clean himself up and telling him to "hold it down." The inmate also described another incident in which officers beat him, injuring his arm. They refused to take him to the clinic for medical care until he agreed to tell the clinic that he hurt his arm playing basketball. He agreed to that story, and as far as he knows, the use of force was never reported.
>
> In August 2013, four adolescent inmates were reportedly brutally beaten by multiple officers. Based on accounts provided by the inmates, several officers assaulted the inmates, punching and kicking them and striking them with radios, batons, and broomsticks. The beating continued for several minutes after the inmates already had been subdued and handcuffed. The inmates were then taken to holding pens near the clinic intake where they were beaten again by several DOC Gang Intelligence Unit members, who repeatedly punched and kicked them while the inmates were handcuffed. Two of the inmates reported that they had lost consciousness or blacked out during the incident. The officers' written statements assert that the inmates instigated the fight and they used force only to defend themselves. The Department's investigation of the incident was ongoing at the time this letter was prepared. The inmates sustained multiple injuries, including a broken nose, a perforated eardrum, head trauma, chest contusions, and contusions and injuries to the head and facial area.

In January 2012, an inmate splashed a correction officer with a liquid substance. While the inmate was flex-cuffed and being escorted away, the correction officer approached him and started punching him in his facial area, according to the investigating Captain's report. The correction officer did not stop until a probe team officer pushed her away from the inmate. The officer then punched the wall in anger. Although the investigating Captain concluded that the force used was "not necessary, inappropriate and excessive," a Tour Commander later reversed that position and concluded that the force used was necessary and within policy.

In January 2013, after reportedly being disruptive while waiting to enter the RNDC dining hall, an inmate, who was on suicide watch at the time, was taken down by a Captain and punched repeatedly on his head and upper torso while he lay face down on the ground covering his head with his hands. The inmate told investigators that the Captain had "punched [him] everywhere." According to the Tour Commander's report, the Captain's use of force was "excessive and avoidable" because the inmate presented no threat while lying on the ground. The inmate sustained bruises to his left and right shoulders, left and right lower arms, chest area, neck, middle back, and a finger on his right hand, as well as an abrasion to his right elbow.

An inmate told our consultant that in February 2013 a probe team Captain lifted his hands up while he was flex-cuffed, fracturing his wrist. According to the inmate's statement to DOC investigators, the Captain told him and the other inmates being escorted that "he would make them suffer," and "cry like babies." Another inmate told investigators the Captain had directed the officers to "make them scream" while the inmates were escorted through the corridor. We reviewed video of the incident showing the inmate being escorted down the corridor while rear-cuffed. We also reviewed medical records confirming that the inmate broke his left wrist as a result of the incident and required surgery. The Department's investigation of the incident was ongoing at the time this letter was prepared.

In January 2014, an inmate sustained significant facial injuries as a result of a use of force incident that occurred in an RNDC school classroom. When interviewed by Board of Correction staff, the inmate reported that he was repeatedly punched and kicked in the head and face by multiple officers. The inmate claimed that the altercation began after a civilian employee's pen had been taken. The inmate was still spitting up

> blood and having difficulty talking when Board of Correction staff interviewed him hours after the incident.
>
> The ID's investigation into an incident involving an inmate who suffered a broken tooth and laceration of the lip when an officer punched him in the face was not completed until 20 months after the incident. The two key officers involved in the incident were not interviewed by the ID until 16 months after the incident.

44. The report concludes with recommendations to address the poor training and lack of accountability among officers.

45. There are numerous other examples of abuse at Rikers Island that are outside the scope of the report as well. The Bronx district attorney's office, said that the two Rikers guards had recruited inmates over three months to serve as "managers, foot soldiers and enforcers" to maintain order in a housing unit for adolescent men. The guards are also accused of training the inmates in how to restrain and assault their victims, and deciding where and when attacks would occur.

46. In 2014, a mentally ill inmate named Bradley Ballard, 39, suffered a gruesome death on Rikers Island after he languished inside a jail cell for seven days. When correction officers finally came to the aid of Ballard he was naked, unresponsive, and covered in feces. His genitals were swollen and badly infected, injuries suffered after he tied a band around his penis.[4]

47. According to *The New York Times,* some 129 inmates, 77% of whom were diagnosed as mentally ill, suffered "serious injuries" in altercations with prison guards over an 11-month period in 2013. These injuries were "beyond the capacity" of the prison doctors to

---

[4] "Mentally ill Rikers Island inmate dies after languishing in jail cell for 7 days", *New York Daily News*, 22 May 2014

treat successfully.[5]

48. On February 15, 2014, Jerome Murdough, a homeless veteran in jail on an accusation of trespassing, was found dead in his cell. After being in jail for one week, he died from overexposure to heat. His cell was over 100 degrees, and he had taken prescription drugs which increase sensitivity to heat. Murdough had been complaining for hours about the heat, but was ignored by prison guards.[6]

49. Jonathan Chasan, a lawyer for the Legal Aid Society's prisoners' rights project stated, "These are institutions where inmate activity is monitored 24 hours a day, and it's astonishing that this kind of behavior should go on for so long unchecked."

50. **During Michael Hourihane's tenure as the top uniformed official in the city Department of Corrections, a class action lawsuit was filed against the DOC for system wide abuse of inmates by correction staff. Chasan stated the city has paid millions during his leadership to settle brutality lawsuits over the past decade.**[7]

51. New York City has been sued in recent years by Rikers inmates claiming to have been the victims of beatings by prisoners while guards looked the other way, or worse, ordered the attacks. The city settled one case for $500,000, and another for just under $100,000. [8]

52. The $500,000 settlement, reached in 2007, concerned a 2003 assault on an inmate named Donald Jackson. During an assault, Jackson's head struck a piece of protruding metal on the floor so hard that he developed a blood clot in his brain and almost died if not for an operation.

53. The city agreed last year to pay $97,500 to Schmi Caballero, who said in his suit that a

---

[5] Michael Winerip and Michael Schwirtz (July 14, 2014). Rikers: Where Mental Illness Meets Brutality in Jail. *The New York Times.* Retrieved July 15, 2014.
[6] Pearson, Jake. "NYC Inmate "Baked to death" in cell". AP News. AP. Retrieved September 29, 2014.
[7] http://blogs.villagevoice.com/runninscared/2012/12/michael_houriha.php
[8] Weiser, Benjamin (February 3, 2009). "Lawsuits Suggest Pattern of Rikers Guards Looking Other Way". *The New York Times*. Retrieved 2009-02-04.

guard became angry that he was taking too long on a call to his mother. The guard subsequently broke the inmate's jaw.

54. A cursory ECF search within the SDNY PACER system shows that Rikers Island has been named as a defendant over a hundred times in the Southern District alone.

55. The same search in the Eastern District yields dozens of results.

56. The same search in Bronx Supreme Court returned hundreds of cases.

57. Defendant City of New York cannot claim ignorance of the culture of violent and unconstitutional behavior when there are a multitude of law suits and dozens of newspaper articles alerting the City. Upon information and belief, the City was and is aware of the problems but has decided to ignore the situation.

58. The Department's failure to curb these patterns and practices that place inmates at ongoing risk of serious harm constitutes deliberate indifference to the inmates' safety while in DOC custody and violates their constitutional rights. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) ("[P]rison officials' malicious and sadistic use of force is a per se violation of the Eighth Amendment, because the conduct, regardless of injury, 'always' violates contemporary standards of decency.") (citing Hudson v. McMillian, 503 U.S. at 9).

59. It is the pervasive culture of violence and deliberate indifference of the City of New York which led to defendant OCASIO abusing MR. WHITE.

60. Upon information and belief, MS. OCASIO's actions are a direct result of the City of New York's disregard for inmate's rights on Rikers Island. The City's deliberate indifference in the face of overwhelming evidence of unconstitutional behavior created a policy and custom of unrestrained use of force that led to MR. WHITE being abused by

MS. OCAISO. *Fisher v. Koehler* states, "evidence of systemic failures" in preventing improper use of force at New York City jails "supports a finding of a 'policy of deliberate indifference' as to staff-inmate violence on the part of defendants". 692 F. Supp. 1519, 1564 (S.D.N.Y. 1988).

61. Upon information and belief, the acts of the Defendants, including the unconstitutional policy, procedure, custom and/or practice described herein, were the legal and proximate cause that led to Plaintiff's damages.

**WHEREFORE,** plaintiff respectfully requests judgment against the Defendants as follows:

1. On the First Cause of Action against all the defendants, compensatory and punitive damages in an amount to be determined at trial, and reasonable attorneys' fees and costs under 42 U.S.C. Section 1988;

2. On the Second Cause of Action, against all Defendants, compensatory damages in an amount to be determined at trial, and punitive damages against the City Defendant in an amount to be determined at trial, and reasonable attorneys' fees and costs under 42 U.S.C. Section 1988;

3. Such other and further relief as this Court may deem necessary in the interest of justice.

Dated: 11/7/2014
Brooklyn, New York

Respectfully Submitted
         /s/
By:   Paul Hale, Esq.
26 Court St. Ste 913
Brooklyn, NY 11242
(718) 554-7344