UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------X

BOBBY WHITE

                       Plaintiff,

               v.

THE CITY OF NEW YORK, *et al.*,

                  Defendants.

------------------------------------------------------X

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: July 31, 2015
```

13 Civ. 7421 (KPF)

<u>OPINION AND ORDER</u>

KATHERINE POLK FAILLA, District Judge:

Plaintiff Bobby White brings this action against the City of New York (the "City") and Marlene Ocasio, formerly a correction officer at Rikers Island, pursuant to 42 U.S.C. § 1983, for alleged violations of his Fourth, Eighth, and Fourteenth Amendment rights. The City has moved to dismiss for failure to state a claim for municipal liability under *Monell* v. *Dep't of Soc. Servs.*, 436 U.S. 658 (1978). For the reasons set forth in this Opinion, the motion to dismiss is granted in part and denied in part.

## BACKGROUND[1]

### A.  Factual Background

#### 1.  Plaintiff's Allegations Regarding Excessive Force

Plaintiff was incarcerated at the George Motchan Detention Center ("GMDC") at Rikers Island during the fall of 2013. (Compl. ¶ 11). He alleges

---

[1]    The facts contained in this Opinion are drawn from Plaintiff's Second Amended Complaint ("Compl." (Dkt. #53)). For convenience, the parties' memoranda of law are cited as "Def. Br." (Dkt. #59), "Pl. Opp." (Dkt. #61), and "Def. Reply" (Dkt. #62). The

that on September 28, 2013, at approximately 12:45 p.m., Defendant Ocasio

"sprayed a chemical agent on [him] while he was in his cell" and "slammed a

metal door on [his] hand." (*Id.* at ¶¶ 12-13).  According to Plaintiff, prior to

Ocasio's use of force, he did not pose a threat to her, and he was not otherwise

engaged in any activity that would justify the use of force.  (*Id.* at ¶ 14; *see also*

*id.* at ¶¶ 21, 22).  Plaintiff further alleges that a video of the encounter exists.

(*Id.* at ¶ 21).

---

Court refers to two other sources throughout this Opinion: (i) an August 4, 2014 letter from the United States Attorney's Office for the Southern District of New York addressed to Mayor Bill de Blasio, Department of Correction ("DOC") Commissioner Joseph Ponte, and Corporation Counsel Zachary Carter (Dkt. #61, Ex. B (the "DOJ Findings Letter"); and (ii) a Complaint-in-Intervention filed by the Department of Justice in *Nunez* v. *City of New York*, No. 11 Civ. 5845 (LTS), which was attached to Plaintiff's opposition (Dkt. #61, Ex. A (the "DOJ Complaint")).

In general, when "considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *DiFolco* v. *MSNBC Cable L.L.C.,* 622 F.3d 104, 111 (2d Cir. 2010).  In considering a motion to dismiss, a court is permitted to take judicial notice of public records, which include complaints and other documents filed in federal court. *See, e.g., Harrison* v. *Diamonds*, No. 14 Civ. 484 (VEC), 2014 WL 3583046, at *2 (S.D.N.Y. July 18, 2014).  When a court takes judicial notice of such documents, it does so "not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings."  *Kramer* v. *Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991).  The DOJ Findings Letter is incorporated by reference in the Second Amended Complaint (Compl. ¶ 41 n.3), and may properly be considered at this stage.

The City argues that the Court should not consider the DOJ Complaint, as it was not attached to or referred to in Plaintiff's Second Amended Complaint.  (Def. Reply 3 ("[P]laintiff first introduced the [DOJ] Complaint as support for his opposition; plaintiff's Complaint does not make any reference to the [DOJ] Complaint.  Thus, the contents of the [DOJ] Complaint have no bearing on this motion, which must be evaluated based upon allegations in the instant complaint.")).  The DOJ Complaint was filed approximately a month after Plaintiff filed the Second Amended Complaint; accordingly, Plaintiff could not have relied upon the DOJ Complaint when drafting the operative pleading.  That said, the Court may take judicial notice of the fact that the DOJ Complaint was filed.  The Court therefore draws facts from the DOJ Findings Letter, and takes notice that these facts eventually led the DOJ to file a Complaint-in-Intervention in *Nunez*.

As a result of the altercation, Plaintiff suffered bruising and swelling on his left forearm, and was instructed to wear a sling by medical staff. (Compl. ¶ 16). Despite his pleas for medical attention, Plaintiff alleges that he did not receive such treatment until "hours later." (*Id.* at ¶ 15). In addition to his physical injuries, Plaintiff has experienced "emotional distress, nightmares, panic attacks, mental anguish and unwarranted severe anger bouts," as well as a fear of the police and a general inability to function at his normal capacity, "which has caused a severe strain and breakdown in his personal relationships." (*Id.* at ¶¶ 23, 26).

Following the incident, Plaintiff filed a grievance, and Ocasio's supervisors subsequently conducted an investigation. (Compl. ¶ 17). The investigators found that Ocasio's use of force was "unwarranted and unnecessary and recommended disciplinary action." (*Id.* at ¶ 18).

### 2.    Plaintiff's *Monell* Allegations

Plaintiff alleges that his mistreatment arose from the City's "deliberate indifference" towards a "pervasive culture of violence" and "disregard for inmate[s'] rights on Rikers Island." (Compl. ¶¶ 58-60). According to Plaintiff, the City's deliberate indifference towards "overwhelming evidence of [correction officers'] unconstitutional behavior created a policy and custom of unrestrained use of force" that led to Ocasio's actions against Plaintiff. (*Id.* at ¶ 60). Further, Plaintiff alleges that the City engaged in a practice of failing to sanction and discipline officers properly, and that "due to their poor training and inexperience, correction officers [at Rikers] lack adequate conflict

3

resolution and de-escalation skills," which has led to a deprivation of inmates' constitutional rights pursuant to Section 1983.  (*Id.* at ¶ 6).

To support these allegations, Plaintiff cites newspaper articles from 2009 and 2014 from *The New York Times*, the Associated Press, the *Village Voice*, and the *New York Daily News*.  More significantly, he cites the DOJ Findings Letter, *see supra* n.1, which details the DOJ's investigation concerning the excessive use of force against adolescent inmates at Rikers Island from 2011 to 2013.  (Compl. ¶¶ 40-52).  In the DOJ Findings Letter, the DOJ asserts that during fiscal year 2013, there were 1,057 injuries among males in 565 reported incidents.  (*Id.* at ¶ 41).  According to Plaintiff, these figures support the existence of a "'deep-seated culture of violence' against inmates," in which "'brute force is the first impulse rather than the last resort.'"  (*Id.* at ¶¶ 40, 42 (citing DOJ Findings Letter 3)).  To that end, Plaintiff provides numerous examples of correction officers abusing prisoners.  For example, Plaintiff includes an excerpt from the DOJ Findings Letter detailing an incident where, after reportedly being disruptive while waiting to enter a dining hall, an inmate was "taken down by a Captain and punched repeatedly on his head and upper torso while he lay face down on the ground."  (*Id.* at ¶ 43).  In that instance, the Tour Commander filed a report and found that the Captain's use of force was "'excessive and avoidable' because the inmate posed no threat while lying on the ground."  (*Id.*).  Significantly, Plaintiff alleges that the DOJ Findings Letter "concludes with recommendations to address the poor training and lack of accountability among officers."  (*Id.* at ¶ 44).

4

Plaintiff also relies heavily on the 79-page DOJ Findings Letter to support his allegations regarding the City's policy and custom of unrestrained use of force against inmates at Rikers Island and its failures in training and supervising correction officers.  In relevant part, the DOJ Findings Letter asserts that:

> the New York City Department of Correction systematically has failed to protect adolescent inmates from harm in violation of the Eighth Amendment and the Due Process Clause of the Fourteenth Amendment of the United States Constitution.  This harm is the result of the repeated use of excessive and unnecessary force by correction officers against adolescent inmates, as well as high levels of inmate-on-inmate violence.
>
> We have made the following specific factual determinations:
>
> - force is used against adolescents at an alarming rate and violent inmate-on-inmate fights and assaults are commonplace, resulting in a striking number of serious injuries;
>
> - correction officers resort to "headshots," or blows to an inmate's head or facial area, too frequently;
>
> - force is used as punishment or retribution; [and]
>
> - force is used in response to inmates' verbal altercations with officers[.]

(DOJ Findings Letter 4).

The DOJ also described the "systemic deficiencies that contribute to, exacerbate, and indeed are largely responsible for the excessive and unnecessary use of force by DOC staff" as including:

> - inadequate reporting by staff of the use of force, including false reporting;
>
> - inadequate investigations into the use of force;

5

- inadequate staff discipline for inappropriate use of force; …

- inadequate supervision of inmates by staff;

- inadequate training both on use of force and on managing adolescents; and

- general failures by management to address adequately the extraordinarily high levels of violence perpetrated against and among the adolescent population.

(DOJ Findings Letter 4).  Further, the DOJ found that

> [i]nmates are beaten as a form of punishment, sometimes in apparent retribution for some perceived disrespectful conduct.  Correction officers improperly use injurious force in response to refusals to follow orders, verbal taunts, or insults, even when the inmate presents no threat to the safety or security of staff or other inmates.

(*Id.* at 11).

In its investigation, the DOJ "reviewed hundreds of thousands of pages of records from both DOC and the Department of Health and Mental [Hygiene ("DOHMH")]," the latter of which provides medical services to inmates at Rikers. (DOJ Findings Letter 2).  The DOJ further identified a sample of "approximately 200 use of force incidents" and interviewed staff from the DOC and the DOHMH on issues related to these and other incidents including "use of force policies and practices, inmate supervision, staffing, the use of punitive segregation, medical treatment of injuries, security, investigations, [and] training."  (*Id.*).  The DOJ determined "that a deep-seated culture of violence is pervasive throughout the adolescent facilities at Rikers, and DOC staff

routinely utilize force not as a last resort, but instead as a means to control the adolescent population and punish disorderly or disrespectful behavior." (*Id.*).

The DOJ concluded that "[t]he [DOC]'s failure to curb these patterns and practices that place adolescents at ongoing risk of serious harm constitutes deliberate indifference to the adolescents' safety while in … custody and violates their constitutional rights." (DOJ Findings Letter 11).

## B. Procedural Background

On October 21, 2013, Plaintiff filed this action *pro se*, naming only Ocasio as a Defendant. (Dkt. #2). On August 21, 2014, Plaintiff, who by then had secured representation, filed an Amended Complaint to include the City as a Defendant. (Dkt. #32). After the Court held a pre-motion conference to discuss the City's anticipated motion to dismiss, Plaintiff was granted leave to file a Second Amended Complaint. The Second Amended Complaint was filed on November 7, 2014. (Dkt. #53). On December 19, 2014, the City filed its motion to dismiss. (Dkt. #58-60). Plaintiff filed his opposition on January 19, 2015 (Dkt. #61), and the motion was fully briefed as of the City's filing of its reply on January 30, 2015 (Dkt. # 62).

## DISCUSSION

## A. Applicable Law

### 1. Motion to Dismiss Under Fed. R. Civ. P. 12(b)(6)

The City has moved to dismiss the Second Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). When considering such a motion, a court should "draw all reasonable inferences in Plaintiffs' favor, assume all

well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief." *Faber* v. *Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks omitted) (quoting *Selevan* v. *N.Y. Thruway Auth.*, 584 F.3d 82, 88 (2d Cir. 2009)).

A plaintiff will survive a motion to dismiss if he alleges "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007); *see also In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) ("While *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to nudge [plaintiff's] claims across the line from conceivable to plausible." (internal quotation marks omitted)). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 557). Moreover, "the tenet that a court must accept a complaint's allegations as true is inapplicable to threadbare recitals of a cause of action's elements, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 663.

"In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *DiFolco* v. *MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010) (citations omitted). "Even where a document is not incorporated by reference, the court may nevertheless consider it where the complaint 'relies heavily upon its terms and effect,' which renders the

8

document 'integral' to the complaint." *Chambers* v. *Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (quoting *Int'l Audiotext Network, Inc.* v. *Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995) (per curiam)).  "[A] plaintiff's *reliance* on the terms and effect of a document in drafting the complaint is a necessary prerequisite to the court's consideration of the document on a dismissal motion; mere notice or possession is not enough."  *Id.* (emphasis in original).

### 2.    Section 1983 Claims Generally

Plaintiff brings claims under Section 1983, which establishes liability for deprivation, under the color of state law, "of any rights, privileges, or immunities secured by the Constitution."  42 U.S.C. § 1983.[2]  "The purpose of § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails."  *Wyatt* v. *Cole*, 504 U.S. 158, 161 (1992) (citation omitted).  As such, a "§ 1983 claim has two essential elements: [i] the defendant acted under color of state law; and [ii] as a result of the defendant's actions, the plaintiff suffered a denial of h[is] federal statutory rights, or h[is] constitutional rights or privileges."  *Annis* v. *County of Westchester*, 136 F.3d 239, 245 (2d Cir. 1998); *see also City of Oklahoma City* v. *Tuttle*, 471 U.S. 808,

---

[2]    Plaintiff makes reference at the outset of the Second Amended Complaint, in brackets, to a claim under Section 1985 for conspiracy to violate his constitutional rights, and to state-law claims.  (Compl. ¶ 1 ("This is an action at law to redress the deprivation of rights secured to the plaintiff under color of statute, ordinance, regulation, custom, and or to redress the deprivation of rights, privileges, and immunities secured to the plaintiff by the Fourth, Eighth and Fourteenth Amendments to the Constitution of the United States, and by Title 42 U.S.C. § 1983, … [and § 1985], [and arising under the law and statutes of the State of New York]." (brackets in original))).  Plaintiff apparently opted not to bring these claims, as he did not refer to these causes of action elsewhere in the Second Amended Complaint.

816 (1985) ("By its terms, of course, [Section 1983] creates no substantive rights; it merely provides remedies for deprivations of rights established elsewhere.").  In the present case, Plaintiff claims violations of his Fourth, Eighth and Fourteenth Amendment rights.

### 3.    *Monell* **Liability**

Municipalities are liable only for their own misdeeds, that is, "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible [for] under § 1983."  *Monell*, 436 U.S. at 694.  Although municipal entities may be sued directly for constitutional violations pursuant to Section 1983 under *Monell*, they may not be held liable for the acts of their employees under the doctrine of *respondeat superior*.  *Pembaur* v. *City of Cincinnati*, 475 U.S. 469, 478 (1986). In other words, "*Monell* does not provide a separate cause of action for the failure by the government to train its employees; it *extends* liability to a municipal organization where that organization's failure to train, or the policies or customs that it has sanctioned, led to an independent constitutional violation."  *Segal* v. *City of New York*, 459 F.3d 207, 219 (2d Cir. 2006) (citing *Monell*, 436 U.S. at 694) (emphasis in *Segal*).

Further, "[p]roof of a single incident of unconstitutional activity is not sufficient to impose liability on a municipality unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy that can be attributed to a municipal policymaker.  *Tuttle*, 471 U.S. at

10

823-24. Thus, "to prevail on a claim against a municipality under Section 1983 based on acts of a public official, a plaintiff is required to prove: [i] actions taken under color of law; [ii] deprivation of a constitutional or statutory right; [iii] causation; [iv] damages; and [v] that an official policy of the municipality caused the constitutional injury." *Roe* v. *City of Waterbury*, 542 F.3d 31, 36 (2d Cir. 2008).

A plaintiff may satisfy the "policy or custom" requirement in one of several ways, including by alleging the existence of

> [i] a formal policy officially endorsed by the municipality; [ii] actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; [iii] a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware; or [iv] a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees.

*Brandon* v. *City of New York*, 705 F. Supp. 2d 261, 276-77 (S.D.N.Y. 2010) (citations omitted).

To satisfy the fourth prong, the plaintiff must "show that the need for more or better supervision to protect against constitutional violations was obvious," which may be established "by showing that there were repeated complaints of civil rights violations," and "deliberate indifference may be inferred if the complaints are followed by no meaningful attempt on the part of the municipality to investigate or to forestall further incidents." *Tieman* v. *City of Newburgh*, No. 13 Civ. 4178 (KMK), 2015 WL 1379652, at *19 (S.D.N.Y.

11

Mar. 26, 2015) (internal quotation marks and citations omitted); *see also Jett* v.

*Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989) (noting municipal liability

may attach where policy maker acquiesces in longstanding practice that

constitutes "standard operating procedure" of local government); *Reynolds* v.

*Giuliani*, 506 F.3d 183, 192 (2d Cir. 2007) (holding that "*Monell's* policy or

custom requirement is satisfied where a local government is faced with a

pattern of misconduct and does nothing, compelling the conclusion that the

local government has acquiesced in or tacitly authorized its subordinates'

unlawful actions"); *Fiacco* v. *City of Rensselaer*, 783 F.2d 319, 328 (2d Cir.

1986) ("Whether or not the claims had validity, the very assertion of a number

of such claims put the City on notice that there was a possibility that its police

officers had used excessive force."). Thus, local governing bodies "may be sued

for constitutional deprivations visited pursuant to governmental 'custom' even

though such custom has not received formal approval through the

government's official decision-making channels." *Monell*, 436 U.S. at 659.

Nevertheless, "[d]eliberate indifference is a stringent standard of fault,"

requiring that a municipal actor "was aware of constitutional injury, or the risk

of constitutional injury, but failed to take appropriate action to prevent or

sanction violations of constitutional rights." *Jones* v. *Town of E. Haven*, 691

F.3d 72, 81 (2d Cir. 2012). Plaintiff must plausibly allege "that the official

made a conscious choice, and was not merely negligent." *Id.* In *City of Canton*

v. *Harris*, 489 U.S. 378 (1989), the Supreme Court established the "deliberate

indifference" standard in the context of a claim for failure to train, but "the

stringent causation and culpability requirements set out in that case have been applied to a broad range of supervisory liability claims," including claims for failure to supervise and failure to discipline.  *Reynolds*, 506 F.3d at 192 (citing *Amnesty Am.* v. *Town of W. Hartford*, 361 F.3d 113 127 (2d Cir. 2004) (failure to supervise); *Berry* v. *City of Detroit*, 25 F.3d 1342, 1354 (6th Cir. 1994) (failure to discipline)).

## B.    Analysis

### 1.    The City's Motion to Dismiss the First Cause of Action for Vicarious Liability Under Section 1983 Is Granted

In addition to pleading a direct Section 1983 claim against Ocasio, Plaintiff's first cause of action purports to hold the City vicariously liable under Section 1983 for Ocasio's excessive use of force.  (Compl. ¶ 31).  To that end, Plaintiff alleges that "[b]y assaulting plaintiff, without justification, ... [Ocasio and the City of New York] deprived Plaintiff of [his] rights in violation of 42 U.S.C. § 1983."  (*Id.* at ¶ 31).[3]  As noted, the City cannot be held vicariously liable under Section 1983.  *Monell*, 436 U.S. at 694.  The first cause of action is therefore dismissed as to the City.

### 2.    The City's Motion to Dismiss the *Monell* Claim Is Denied

The weightier question before the Court is whether Plaintiff has adequately alleged a "policy or custom" such that his *Monell* claim against the

---

[3]      Although municipalities may be held vicariously liable for the state-law torts of their employees, *see, e.g.*, *Linson* v. *City of New York*, 951 N.Y.S.2d 167, 168 (2d Dep't 2012), Plaintiff has not alleged any violations of state law in the Second Amended Complaint. (*See* Def. Br. 10-11).

City may proceed.[4]  After accepting as true all allegations in the Second Amended Complaint, and drawing all reasonable inferences in Plaintiff's favor, the Court concludes that the City's motion must be denied.

The Court recognizes that determining whether a complaint states a plausible claim for relief is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.  In the instant case, the Court is persuaded that Plaintiff's incorporation of the DOJ Findings Letter, which details the rampant use of excessive force at Rikers Island, "nudge[s] [Plaintiff's] claims across the line from conceivable to plausible." *In re Elevator Antitrust Litig.*, 502 F.3d at 50.

Plaintiff's Second Amended Complaint satisfies the policy or practice requirement in two separate ways.  First, with respect to the allegations that use of excessive force is unconstitutionally pervasive, the "operative inquiry at this stage is not whether the DOJ [Findings Letter] and its conclusions will ultimately support a finding of *Monell* liability, but rather whether Plaintiff has sufficiently alleged a policy or practice that is widespread and of which policymakers must have been aware." *Kucharczyk* v. *Westchester County*, No. 14 Civ. 601 (KMK), 2015 WL 1379893, at *11 (S.D.N.Y. Mar. 26, 2015); *see also id.* at *10 (finding that "the DOJ Report appended to Plaintiff's Complaint [was] sufficient to allege a widespread practice" at the jail of providing "inadequate infection control; inadequate access to dental care; and an

---

[4]    The City does not argue for dismissal based on Plaintiff's failure to satisfy the other elements of a *Monell* claim.

inadequate medical grievance process"); *Santiago* v. *Westchester County*, No. 13 Civ. 1886 (LGS), 2014 WL 2048201, at *6 (S.D.N.Y. May 19, 2014) (denying municipality's motion to dismiss where plaintiff relied on the "results of the [DOJ investigation under the Civil Rights of Institutionalized Persons Act, which] allegedly concluded that the Westchester County Jail inadequately protected inmates from harm and use of excessive force by staff"); *Bektic-Marrero* v. *Goldberg*, 850 F. Supp. 2d 418, 431 (S.D.N.Y. 2012) (denying motion to dismiss *Monell* claim where prisoner's allegations of inadequate medical care were "distressingly reminiscent" of widespread problems identified in a government report); *Shepherd* v. *Powers*, No. 11 Civ. 6860 (LTS), 2012 WL 4477241, at *10 (S.D.N.Y. Sept. 27, 2012) (denying motion to dismiss where plaintiff relied heavily on an investigatory report that "documented extensive constitutional deficiencies in the … protection of inmates against the use of excessive force").  In the Second Amended Complaint, Plaintiff has adequately alleged use of excessive force against inmates at Rikers Island that was sufficiently pervasive that supervisors must have been aware of it, and yet failed to take the necessary actions to curb it.

The City argues that incidents recounted in the DOJ Findings Letter and the DOJ Complaint bear insufficient resemblance to the facts alleged in Plaintiff's Second Amended Complaint.  (*See* Def. Br. 7-9; Def. Reply 4).  The City notes that the DOJ focused on adolescent inmates, whereas Plaintiff was in his mid-twenties when he was at Rikers Island.  (Def. Reply 4).  Although the Court is cognizant that the DOJ's investigation was conducted within certain

age parameters, the Court is not convinced that the distinctions make a difference at this stage.

The DOJ specifically noted:

> Our focus on the adolescent population should not be interpreted as an exoneration of DOC practices in the jails housing adult inmates.  Indeed, while we did not specifically investigate the use of force against the adult inmate population, our investigation suggests that the systemic deficiencies identified in this report may exist in equal measure at the other jails on Rikers.

(DOJ Findings Letter 3).  The Court also finds the parallels in the underlying conduct that is alleged to have occurred during the exact same time period at Rikers Island to be sufficiently similar to make plausible Plaintiff's claim that his injuries were caused by the same widespread practice detailed in the DOJ Findings Letter.  *Cf. Plair* v. *City of New York*, 789 F. Supp. 2d 459, 466 (S.D.N.Y. 2011) ("Given the passage of time and the installation of a new DOC Commissioner and other supervisory staff between the prior violent incidents and the alleged abuse of Plaintiff, as well as the general failure of Plaintiff to plausibly allege that a policy or custom underlay these acts of violence, Plaintiff has not sufficiently alleged that the violence which harmed him was part of a larger policy or custom at the DOC."); *see also id.* at 469-70 (finding that "the prior violent incidents relied upon by Plaintiff are too attenuated and isolated from his own injury to plausibly establish (a) a policy or custom of violence against prisoners, and (b) that his injury was linked to that policy or custom").

Plaintiff alleges that Ocasio sprayed him with a chemical agent for no apparent reason, and then slammed a door on his hand.  (Compl. ¶¶ 12-13).

The DOJ Findings Letter is replete with similar accounts.  (*See, e.g.*, DOJ Findings Letter 18 ("[A] Captain injured a mentally ill inmate … by forcefully closing the rear slide door of the cuff port of his cell on the inmate's left arm."); *id.* at 33 ("[A]n officer had inappropriately sprayed an inmate with [pepper] spray during an argument, when the inmate was clearly not a threat to the officer at the time."); *id.* at 65-66 ("[T]he Captain directed [an officer] to mace Inmate A, which he did.  The officer then punched Inmate A on the right side of his face."); *id.* at 73 ("Another officer asked if anyone had pepper sprayed [the inmate] yet, and then proceeded to spray him directly in the eye, one inch from his eye.  According to Inmate H, he did not fight back while the officers were beating him.")).

In addition to the DOJ Findings Letter, Plaintiff also cited lawsuits in recent years by Rikers Island inmates claiming to have suffered beatings by guards.  For instance, Plaintiff alleges that the City paid $97,500 to an inmate last year after an incident in which a guard broke the inmate's jaw after becoming angry that the inmate was "taking too long on a call to his mother." (Compl. ¶ 53).  Plaintiff argues that these lawsuits suggest that the City "was and is aware of the problems but has decided to ignore the situation." (*Id.* at ¶ 57).  Courts have taken into account the existence of similar lawsuits when deciding whether a plaintiff has adequately alleged a *Monell* claim.  For example, the district court in *Shepherd* noted that "the steady stream of suits against the County alleging excessive use of force in the [Westchester County Jail]" added further credibility to the claims alleged in the complaint.

17

*Shepherd*, 2012 WL 4477241, at *10; *see also McCants* v. *City of Newburgh*, No. 14 Civ. 556 (VB), 2014 WL 6645987, at *4 (S.D.N.Y. Nov. 21, 2014), *clarified on denial of reconsideration*, 2014 WL 7398910 (S.D.N.Y. Dec. 9, 2014) (finding that the plaintiff's reference to other lawsuits demonstrated that the municipality "was on notice to the possible use of excessive force by its police officers on seventeen different occasions").

Second, Plaintiff adequately alleges a failure by the City to provide adequate training and supervision to correction officers that amounts to deliberate indifference to Rikers Island inmates.  Once again, Plaintiff relies on the factual findings and conclusions contained within the DOJ Findings Letter to support his claims that as a result of their poor training, inexperience, and inadequate supervision, correction officers at Rikers Island engaged in a practice of using excessive force against inmates in deliberate indifference of the inmates' constitutional rights.  (*See* Compl. ¶ 60; *see also* DOJ Findings Letter 4).  At this stage in the proceedings, the Court finds those claims plausible, based on Plaintiff's allegations that the "need for more or better supervision to protect against constitutional violations was obvious" at Rikers Island, and the City failed to take meaningful action to remedy and prevent such violations.  *Cf. Vann* v. *City of New York*, 72 F.3d 1040, 1049 (2d Cir. 1995) (considering issues in context of summary judgment; reversing grant of summary judgment in favor of municipal defendants).

The City argues that Plaintiff has failed to plead any facts to suggest that the City failed to train or discipline Ocasio.  (Def. Br. 6).  Moreover, the City

argues that the existence of the internal DOC investigation, disciplinary charges against Ocasio, and recommendations for further training "run directly counter to any contention that there is a failure to train or supervise correction officers." (*Id.* at 7).  Although these arguments may find traction at summary judgment or at trial, the Court disagrees that they warrant dismissal at this early stage.  First, the salutary detail that Ocasio was disciplined after the fact has no bearing on the issue of whether the City properly trains or supervises correction officers.  The City's argument regarding correction officer discipline is also counterbalanced by Plaintiff's allegation that the *only* reason Ocasio was disciplined was because the incident was caught on camera.  (Compl. ¶ 21).  This allegation, while made without the benefit of confirmatory discovery, nonetheless resonates given the significance ascribed to video evidence in the DOJ Findings Letter.  (*See, e.g.*, DOJ Findings Letter 28 ("The [DOC] relies heavily on video recordings in those instances where correction officers are actually charged and disciplined for excessive or inappropriate force.  The head of the Investigation Division noted, for example, that video evidence is critical in cases of excessive or inappropriate force because that is the evidence that is most clear cut.")).  Finally, the fact that the investigators recommended further training for Ocasio following her altercation with Plaintiff does not undermine Plaintiff's allegations regarding the extent of failures in correction officer training and supervision.  True, the post-incident recommendation for further training could mean that the City is committed to having well-trained correction officers; it is equally plausible, however, that the City's post-incident

recommendation for further training is indicative of a more fundamental failure to train correction officers before they are placed in situations in which they must decide whether and how to use force.

In sum, the City essentially asks the Court to draw an inference in its favor — namely that its conduct following the incident is revealing as to the City's true policies and practices when it comes to the use of excessive force by correction officers. But drawing such an inference at this stage would be inappropriate. Reasonable inferences must be drawn in Plaintiff's favor. Accordingly, his *Monell* claim survives the instant motion.

## CONCLUSION

For the foregoing reasons, the motion to dismiss Plaintiff's first cause of against the City is GRANTED; the motion to dismiss Plaintiff's second cause of action against the City is DENIED.

The City shall file its answer by **August 21, 2015**.

It is hereby ORDERED that the parties appear for a conference on **September 2, 2015, at 3:30 p.m.**, to be held in Courtroom 618 of the Thurgood Marshall Courthouse, 40 Foley Square, New York, New York, to discuss how this case will proceed. The parties shall submit a proposed Case Management Plan to the Chambers inbox in PDF format by **August 27, 2015**, and are permitted to file a joint status letter by that same date if there are specific issues the parties would like to address with the Court at the conference.

The Clerk of Court is directed to terminate Docket Entry 58.

SO ORDERED.

Dated:    July 31, 2015
          New York, New York

                                    _____
                                         KATHERINE POLK FAILLA
                                       United States District Judge